IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

EILEEN G. FAIR,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C04-3077-MWB

**REPORT AND RECOMMENDATION**

——————————

## *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . **2**

    *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*    *Introductory facts and Fair's hearing testimony* . . . . . . . . . . . . **3**
        *2.*    *Fair's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . . . **34**
        *4.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

*III.*   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND*
        *THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . . **40**

    *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . . . **40**
    *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . . . **43**

*IV.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

*V.*    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

# I. INTRODUCTION

The plaintiff Eileen G. Fair ("Fair") appeals a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Fair claims the ALJ's opinion regarding her ability to work is not supported by substantial evidence and is inconsistent with the evidence. She also claims the ALJ failed to evaluate her credibility properly. (See Doc. No. 12)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On May 16, 2001, Fair protectively filed an application for DI benefits, alleging a disability onset date of June 12, 1998. (R. 93-98) Fair alleged she was disabled due to neck and back problems, fibromyalgia, and foot pain, which prevent her from doing any kind of repetitive work, sitting or standing for very long, or lifting heavy objects. (R. 108) She alleged her doctor had told her to stop working due to her health problems. (Id.) Her application and request for reconsideration both were denied, based on a determination that Fair was able to perform unskilled, sedentary work. (R. 80-91; see R. 86)

Fair requested a hearing (see R. 92), and a hearing was held before ALJ John P. Johnson on October 15, 2003, in West Des Moines, Iowa. (R. 35-79) Fair was represented at the hearing by attorney Jean Mauss. Fair testified at the hearing, and Vocational Expert ("VE") Julie Svec also testified.

On February 25, 2004, the ALJ ruled Fair was not entitled to benefits. (R.12-29) Fair appealed the ALJ's ruling, and on July 29, 2004, the Appeals Council denied Fair's request for review (R. 8-10), making the ALJ's decision the final decision of the Commissioner.

Fair filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated

September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Fair's claim. Fair filed a brief supporting her claim on February 11, 2005. (Doc. No. 12) The Commissioner filed a responsive brief on March 25, 2005 (Doc. No. 16), and Fair filed a reply brief on April 5, 2005 (Doc. No. 18). Without seeking leave to do so, the Commissioner filed a response to Fair's reply on April 11, 2005 (Doc. No. 18)

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Fair's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Fair's hearing testimony

At the time of the hearing, Fair was forty-six years old, about 5'5" tall, and weighed 232 pounds. Her weight has risen since she quit working in 1998, a fact she attributes to medications and an inability to get out and exercise. (R. 47)

Fair graduated from high school, but has no further education. She can read and write but has difficulty remembering what she reads. Fair lives with her husband and her grown son. Her husband is employed, and Fair has medical insurance through his job. (R. 39-40)

Fair last worked in 1998, when she was self-employed as a daycare provider. She kept about eight children in her home. She fixed meals and kept track of the kids, and she was on her feet a lot of the time. She cared for one small infant, and the rest were toddlers, ages two to four years old. She lifted up to twenty pounds as part of the job. She quit running a daycare business because she was in a lot of pain, and even with a helper, she got overly tired. (R. 40, 62) The pain and fatigue made working "just a struggle for [her] every day." (R. 43) According to Fair, her doctor told her to quit working. (R. 40)

Fair was diagnosed with fibromyalgia in June 1996, but she did not apply for disability benefits right away because she thought her husband's income would be sufficient to handle their bills and her medical expenses. Her insurance costs $465 monthly and her medications are over $300 monthly. (R. 42)

Prior to starting her daycare service, Fair worked at a chemical supply company as lead lab tech. She would run tests on chemical samples, and she kept paper and computer records of the test results. The job required her to be on her feet most of the time, and also required light lifting of ten to fifteen pounds. She quit the job because of pain in her lower back and hips that caused her problems with walking and caused her to miss a lot of work. (R. 41-42, 62-63)

Fair's condition has not improved since she quit working. She sees two doctors for her fibromyalgia, Don J. Woodhouse, M.D. and Michael J. Finan, M.D. (R. 43) She sees Dr. Woodhouse once a month for medication checks, and for physical therapy on her shoulder. She only sees Dr. Finan if she has a problem Dr. Woodhouse is unable to address. (R. 65)

Fair has pain in her neck, the backs of her shoulders, her hands, lower back, hips, legs, and feet. She never has a pain-free day, and she never wakes up feeling good. When her pain reaches an intolerable level, she goes to the emergency room, where she may receive pain shots and additional medications. (R. 43, 51)

The pain in her shoulders is sometimes throbbing, and other times it travels up into her neck. The pain sometimes prevents her from being able to move her left shoulder. In her back, the pain can become "really sharp," and may make her nauseous. She gets muscle spasms throughout her whole back. (R. 44) Regarding her hip and leg pain, Fair stated her legs feel like "stubs" because of the burning pain going from her hip down to her knee. Her feet sometimes hurt so much she can hardly walk on them. (R. 44-45) Her hands become cold and achy and she sometimes is unable to make a fist. She has

difficulty gripping and holding onto things, and her fingers swell so badly that she had to have her rings enlarged. She uses paraffin baths for her hands. (R. 45, 66)

For pain relief, Fair uses a heating pad, paraffin baths, braces for her feet, medications, and a TENS unit. She tries to use the TENS unit every day, but she requires assistance to use it on her back. She soaks in a hot bath before her afternoon nap and before she goes to bed at night to help relieve pain in her legs between her hips and knees. She uses a cane to walk. She stretches as much as she is able, and she has had injections in her hips, shoulders, and neck. The injections help, but not for long. The medications help her pain but they also make her very tired. At the time of the hearing, she had recently changed her muscle relaxer to Zanaflex, which she was taking three times daily. She stated the medication made her so tired, she had to sleep for a couple of hours after each dose. (R. 45-47, 52)

Fair especially has problems with her left shoulder. She had an automobile accident in 1995, and another back in the 1980s, and according to Fair, her doctors believe she has a spur in her shoulder, or her shoulder somehow did not heal properly. She is unable to move her shoulder well, she cannot raise her left arm, and she cannot hold her arm out in front of her at a ninety-degree angle. She has to be careful when she uses her left shoulder. (R. 48)

Fair takes medications to help her sleep, but even with the medications, she does not fall asleep right away. She tries to wait until at least 9:30 or 10:00 at night to go to bed, and pain wakes her up frequently during the night. She usually wakes up between 2:00 a.m. and 4:00 a.m. due to pain, and she stays up for a couple of hours until she can take more pain medication before returning to bed. She may sleep until 9:00 a.m. or 10:00 a.m., and then she takes a nap in the afternoon. She never feels completely rested, and the fatigue affects her ability to think clearly. She tends to forget things, even in the middle of a conversation. (R. 49-50)

The amount of fatigue Fair experiences also affects her pain level. When she is more tired, her pain is worse. Other things that make her pain worse include standing, walking, activity, cold, and humidity. (R. 50)

Fair is able to drive, but she does not drive long distances because of pain in her shoulders. She had an automobile accident in June 2003, and she lost her license for a few months after the accident because, according to Fair, her doctor thought she had fallen asleep at the wheel, and he did not want her to drive while they worked on switching her medications. (R. 53) The accident occurred a quarter mile from Fair's home. (Id.) Fair estimated she drives about fourteen miles a week. When she drives, her shoulders "get really sore" and she has to place her hands down on the bottom part of the steering wheel. In addition, she has trouble turning her neck to look back, and she has to rely on her side mirrors to see behind her. (R. 66-67)

When Fair first was diagnosed with fibromyalgia, she felt confident she would be able to overcome the disease and continue with her normal activities. She now feels the disease has "taken everything away that [she] used to like to do and to be able to act like a normal person and not be[] so tired and in pain all the time." (R. 53-54) Fair sees a therapist for her depression when she "can afford to go." (R. 45) However, Fair quit seeing her therapist regularly in May 2003, because Fair had trouble finding someone to drive her to Webster City for the appointments. (R. 68) In addition, Fair indicated she felt drained after a therapy session, and she felt "like [her] feelings and everything [were] just so exposed." (R. 55)

Fair's depression prevents her from leaving the house often, and she has "a hard time talking to people" due to her memory problems. (Id.) She has difficulty recalling television shows she has seen and people's names, and she forgets to pay bills. (R. 56) She believes her depression and fatigue make her more irritable. Fair apparently was tearful during the ALJ hearing, which she stated is a regular occurrence whenever she

feels under stress.  (R. 55-56)  She is "weepy" two to fours days a week, which she stated makes her family "feed bad."  (R. 56)

Fair's family helps with all the household duties that require bending over or a lot of arm work, such as vacuuming, dusting, mopping, and cleaning the bathtub.  They also help with the laundry.  She uses a "pick-up stick" to pick up laundry, and she just picks up a little at a time.  Fair cooks, but not as much as she used to, and she cannot carry a heavy pan of food.  She avoids lifting anything heavy.  She cannot lift a gallon of milk easily, and she sometimes drops her plate or her glass because her hands "just don't cooperate."  (R. 56-57)

Fair estimated she can only stand for five minutes before she has to sit down because of pain in her lower back and hips.  She cannot walk the length of a city block without pain.  She can sit for no longer than twenty to twenty-five minutes, and when she gets up, she will "waddle" due to pain in her hips and lower back.  She can climb the three stairs up to her back porch, but has difficulty climbing stairs.  She avoids stooping, kneeling, crouching, and postures that take her close to the floor because of pain in her lower back, and because she has difficulty getting up from those positions.  She has problems daily using her hands.  Changes in the weather can make her stiff and affect her movement.  (R. 58-59)

On a typical day, Fair gets up between 9:00 a.m. and 10:00 a.m.  She soaks in the bathtub.  She may try to do some dishes, if she feels well enough, but she does not do dishes or other housework every day.  She can dress herself if her garments do not have a lot of buttons.  If her shoulders cooperate, she can wash her hair, but she is unable to wash her hair every day.  She cannot move around at the same pace she used to because of her pain.  She can do limited grocery shopping by herself, but her husband or son usually help her.  She is unable to read for very long, and she cannot crochet anymore due to pain in her hands.  She does not belong to any civic groups or clubs.  (R. 59-61)

Fair listed her current medications as Ultram, Extra-Strength Tylenol, Effexor, Ambien, and Zanaflex. (R. 65) She suffers side effects from her medications. The Zanaflex causes her to sweat profusely and it makes her drowsy. Her pain medications also make her drowsy. (R. 57)

The ALJ questioned Fair about additional work history contained in the record. In office notes from April 26, 2000, Dr. McKee noted he was seeing, on referral from another physician, "Ms. Eileen Fair, a 43-year-old right-handed bookkeeper for the family business, . . . for neurologic consultation." (R. 287) Fair stated she had not "done anything for money," and her family no longer owned a business. (R. 64)

An emergency room record from April 15, 2001, when Fair was seen for pain and swelling in her left leg, indicates Fair "and her [significant other] are truckers with prolonged riding trips." (R. 228) The record goes on to say Fair had "been on the road a lot, in terms of truck driving as an occupation." (R. 229) Fair stated her husband is a truck driver but she has never been licensed and does not team drive with her husband. (R. 64)

## 2. *Fair's medical history*

Fair was involved in a car accident in about 1982, and it took three years for her pain to improve. She was a passenger in a car that was hit from behind on May 29, 1995, which apparently aggravated her preexisting pain. Fair began seeing Donna J. Bahls, M.D. on June 14, 1996, and Dr. Bahls diagnosed her with cervical, thoracic, and lumbar strain, and probable fibromyalgia. She prescribed Trazodone and Naprosyn, advised Fair to discontinue massage therapy, and directed her to continue seeing a chiropractor and begin a water exercise program. Fair began doing the water exercises twice weekly. She also tried walking, and she decreased the amount of lifting she had to do in her home daycare business. Fair reported improvement in her pain from these measures. In December 1996, Fair's husband reported that Trazodone made Fair somewhat irritable,

but otherwise she apparently had no side effects from the medications. (R. 174-79) Fair's prescriptions for Naprosyn and Trazodone were refilled regularly.

In July 1997, Fair injured her right kneecap and lower leg while she was horseback riding. She wore a splint for several weeks and used ice, a knee wrap or brace, crutches, and isometric exercises to help her knee heal and reduce radiating pain from the knee injury. (R. 163-73, 180, 294, 315-16) By October, she was still in a lot of pain, and she was scheduled for arthroscopic surgery. (R. 182-83, 188) She was concerned about stopping her medications during the week prior to surgery, and she advised the doctor that "with her fibromyalgia, she cannot miss one dose [of medication] or she is in so much pain." (R. 170) A partial medial menisectomy and resection of plica was performed on Fair's knee on October 24, 1997. Her postoperative diagnosis was: "Tear of the medial meniscus. Chondromalacia of the patella and medial synovial plica." (R. 185) Fair tolerated the procedure well.

On November 4, 1997, Fair saw her doctor complaining of pain in her knee. She stated one of the children at her daycare had run into her knee. She went back to using a crutch, and was directed to use ice and elevate her knee. The doctor called in a refill of Vicodin, and Fair indicated she would put her full-time helper "to good use." (R. 258) When Fair was seen a week later for follow-up, she reported "doing pretty well," with "good relief of pain." (Id.) She was doing some exercises at home. Notes indicated she still had "quite a bit of weakness" in her leg. (Id.)

Fair saw Dr. Bahls again in February 1998, after about a fourteen-month absence from the doctor's care. Dr. Bahls noted Fair had fallen in December 1997, and fractured two ribs on her right side. Notes indicate that as of February 1998, Fair was running a home daycare, and she had "21 children in and out of her home throughout the day." (R. 256) She also was caring for her ten-month-old grandchild. Fair indicated she had decided to decrease the number of children she was caring for, and she expressed concern about telling parents she would not be caring for their children any longer. In addition,

Fair's husband indicated Fair had been under a lot of stress. Fair reported that she had resumed walking on a treadmill for twenty minutes daily and riding an exercise bike for five minutes daily. She stated that even before her fall, "she was having increasing pains, and she ache[d] along her spine and her legs [were] sore." (Id.) She described increased sleeping problems, night sweats and occasional daytime sweating, "heaviness in her arms," and problems with concentration and memory. (Id.)

Dr. Bahls recommended Fair see another doctor to determine whether hormone supplements might help some of her symptoms, and also recommended she have her thyroid function checked. The doctor noted, "I do feel she is clinically depressed, and I would like her to try Prozac 20 mgs qam. . . . I feel she needs to be on it at least 3 months." (Id.) The doctor advised Fair to "pace her activity," and opined decreasing Fair's work load in the daycare would help. Fair was seeing a chiropractor twice weekly, and Dr. Bahls indicated she could continue doing so "for a period of time to see if it was offering her much long-term benefit." (R. 255-56)

Fair called Dr. Bahls on March 5, 1998, to report the Prozac was helping her emotionally and she felt less stressed. Her muscle pain was improved. She had decreased the number of children in her daycare, which she also felt had helped her symptoms. Dr. Bahls directed her to continue taking Prozac for two more months. (R. 255)

Dr. Bahls continued to refill Fair's prescriptions for Naprosyn and Trazodone on a regular basis. (See, e.g., R. 254-55) On September 23, 1998, Fair called Dr. Bahls complaining of pain in her legs at night, with her left leg hurting worse than her right. She was still doing the water exercises twice a week, and was trying to walk or ride her exercise bike. She stated the soreness was worse for several days after she exercised in the water. The doctor opined Fair might be too active in the water, and she advised Fair to decrease her activity. The doctor increased Fair's Trazodone dosage for seven to ten days, with instructions to taper it back down if she began sleeping better. (R. 254)

It appears Fair did not see a doctor again until March 18, 1999, when she returned to see Dr. Bahls "to discuss her fibromyalgia complaints." (R. 253) Fair reported pain in her hips, radiating down into her legs. She also reported pain starting between her shoulder blades and radiating up into her neck. The pain would be accompanied by difficulty breathing, and sometimes came on while she was watching television or having dinner with friends. Fair felt these pains had been worsening, and stated they occurred without warning. She had stopped doing the water exercises because she felt the cold water was irritating her symptoms, but she had gone to a motel a time or two to sit in a jacuzzi tub, which she stated gave her a lot of relief. Fair admitted to being under a lot of stress. Her husband had undergone back surgery and was unable to help as much around the house. She had greatly decreased the number of children in her day care, and was only caring for three children. She reported being tearful and forgetful, and she had gained weight. Dr. Bahls felt Fair "was clinically depressed," and she started Fair back on Prozac, which had helped her in the past. She discontinued the Naprosyn, and advised Fair to use Advil as needed. She also gave Fair samples of Celebrex and Daypro. Fair was directed to call the doctor in one month to report on her condition. Fair's blood test results were normal. (R. 252-53)

Fair called Dr. Bahls's office on April 22, 1999, and stated she was "feeling great." (R. 252) She was taking Prozac in the morning and Trazodone before bed. "She also said she hardly takes anything for pain." (Id.)

Fair's knee began bothering her again in May 1999, and on May 11, 1999, she saw Joshua D. Kimelman, D.O. complaining of increased pain and aching in the front of her right knee. The doctor noted "diffuse tenderness both medial and lateral joint lines," good range of motion, and weakness. He recommended she continue using nonsteroidal antiinflammatory drugs, advised her to return in one month, and referred her to physical therapy. (Id.) Fair went to physical therapy on May 11, 14, and 17, 1999, each time reporting extreme soreness that seemed to increase with activity. The pain became worse

with therapy, and no type of modality appeared to decrease the pain. Dr. Kimelman was informed, and he ordered an X-ray of her knee. (R. 195-98, 251) The X-ray showed mild osteoarthritis of Fair's right knee, including the patellofemoral joint. (R. 203)

Physical therapist Tracy Porter wrote a report to Dr. Kimelman on May 28, 1999. Porter reported that Fair had been seen for six physical therapy visits, but she continued to have "severe right knee pain." (R. 196) Fair had significant crepitus when she moved her knee. She had pain with full range of motion and was unable to extend her knee fully without severe pain. The therapist had tried various modalities to decreased Fair's irritation, including ultrasound and electrical stimulation, but Fair got no relief from any of these. She got minimal relief from having her kneecap taped to correct patellar tracking, but she had been unable to tolerate exercise. Porter opined Fair would benefit from continued quadriceps strengthening exercises, but noted Fair would "need pain control prior to being able to participate in physical therapy." (Id.)

Fair returned to see Dr. Kimelman on June 1, 1999. She continued to complain of knee pain. She had been using "strapping on her knee for lateral migration of the patella." (R. 251) Examination revealed "marked weakness of the quadriceps," no effusion, and diminished range of motion on full extension. Dr. Kimelman recommended Fair continue with straight-leg-raising exercises, and he gave her "a jay buttress brace" and samples of Voltaren. (Id.) Fair's physical therapy continued, and Fair continued to complain of pain, difficulty tolerating the exercises, and sleep disturbance due to pain. (R. 194, 250) Dr. Kimelman scheduled an MRI of Fair's knee, which revealed a "mild partial tear of the anterior cruciate ligamentous sheath without evidence of true ligamentous tear." (R. 202) Fair's physical therapy continued, but by July 8, 1999, the therapist noted Fair's progress had "plateaud." (R. 193) Dr. Kimelman prescribed Arthrotec, and he administered a cortisone injection to Fair's knee. He directed her to use ice and continue her quadriceps exercises. (R. 249-50) Fair reported no relief from the injection. (R. 193)

On September 3, 1999, Fair saw Don J. Woodhouse, M.D. with a complaint of neck pain. Fair's chiropractor had suggested she might have "a disk out." (R. 291) The chiropractor reported he had been working with Fair for several weeks and her condition was continuing to worsen. Fair denied pain, tingling, or loss of strength in her upper extremities, and denied radiation of pain down her back. However, she reported having a lot of headaches, and pain directly in her neck. X-rays of Fair's cervical spine "showed mild to moderate degenerative disease and no acute disc space narrowing." (Id.) An occipital nerve block was administered, and Fair experienced "a fair amount of relief into her head" within about fifteen minutes following the injection. "The pain went away at rest after that and it still irritated her to do much movement." (Id.) She was diagnosed with cervical radiculopathy. The doctor scheduled a CT scan of Fair's cervical spine "to evaluate her nerve root canals," and he prescribed a Medrol Dose Pak and Tylenol #3. (Id.) The CT scan of her neck was performed on September 7, 1999. The scan showed some mild osteoarthritis of the cervical facets, but otherwise was normal. (R. 306)

Fair saw Renald Bernard, M.D.[1] on January 31, 2000, with a report that she had been home watching TV four days earlier and suddenly felt severe pain in her neck and cervical area, radiating to both shoulders, equal on both sides. She had taken Aleve with no improvement. She arrived at the appointment wearing a soft neck collar, which the doctor removed. He noted Fair's cervical spine was painful upon palpation, and Fair's range of motion, flexion, extension, and lateral motion all were very limited and painful. The doctor diagnosed a likely cervical sprain. He prescribed Vioxx for six days, Lortab as needed, and application of heat. She was advised to return for follow-up as needed. (R. 291)

---

[1]Dr. Bernard is in the same medical clinic as Dr. Woodhouse.

On February 17, 2000, Fair saw Dr. Bernard for purposes of beginning a weight-loss program. She was given some samples of Xenical, and was advised to begin exercising and limit her fat intake to less than 30%. (R. 290)

On March 24, 2000, Fair went to the E.R. complaining of right hip pain that had come on while she was dancing. She stated the pain radiated down her right leg. She was ambulatory but visibly limping. On examination, Fair exhibited pain on straight leg raising, but otherwise her exam was normal. The doctor's impression was "[p]ossible slipped disc." (R. 204) He prescribed a Prednisone taper and Vicoprofen. (Id.) X-rays of Fair's pelvis and lumbar spine showed "osteoarthritis involving both hip joints with narrowing of the joint spaces bilaterally"; "[d]egenerative disc disease of L3/4 and L4/5 discs"; and "[a]nterior degenerative spur formation of L3, L4, and L5." (R. 205)

On March 27, 2000, Fair returned to see Dr. Woodhouse for follow-up of her back pain. She reported no real improvement in her pain, noting she hurt worse in the evening, and she was having difficulty sleeping. She was trying to stay active, but had recently limited her amount of walking due to pain. Chiropractic treatment had not improved her symptoms. She noted she had decreased the number of children in her daycare. Upon examination, the doctor noted Fair's extension was "really limited in lateral motion," and she had hypertenderness upon palpation of her lumbar spine and both sacroiliac joints. (R. 290) The portion of this record entry relating to the doctor's assessment and treatment are missing from the record.

Fair saw Dr. Bernard on April 6, 2000, for follow-up of her weight-loss program. She had lost three pounds and was still taking Xenical. She complained of "really severe back pain" that lasted all day long but began worsening in the afternoon and through the evening. She was having sleep difficulties due to pain. On a scale of 1-10, she stated her pain was at the top of the scale most of the time. Dr. Bernard's assessment was "[r]ecurrent back pain secondary to degenerative lumbar spine." (R. 288) He prescribed Lortab and referred her for a neurology consult. The doctor noted Fair might benefit

from steroid injections but he wanted to get the consultation first.  He directed Fair to try to walk as much as possible and stay active.  (Id.)  Fair called the clinic on April 20, 2000, complaining of severe pain in her right hip down into her leg, worse on ambulation.  She stated Lortab was not controlling her pain, and she could not sleep through the night.  She was directed to come into the clinic, and upon examination, she was noted to be in acute distress.  She walked in a slightly bending position.  Her ranges of motion were limited and painful.  She exhibited pain upon palpation of her lumbar spine and in both sacroiliac joints, and Lasègue's sign was positive on the right side[2].  The doctor noted some atrophy involving Fair's "right inferior limb compared to the left."  (R. 289)  The doctor noted Fair's severe back pain most likely was related to degenerative changes in her lumbar spine.  He stopped the Lortab and prescribed Oxycodone, and application of heat and cold.  (Id.)

Fair was seen by neurologist John R. McKee, M.D. on April 26, 2000, for evaluation of her right low back and thigh pain.  Fair reported that her present symptoms had begun "last year" with pain in her right lower back, extending into the lateral thigh and hip.  The doctor noted it was not clear that Fair's thigh symptoms were related to her back pain.  Fair's examination was normal except for positive straight-leg-raising on the right, and the fact that she "was considerably overweight."  (R. 287)  She limped on her right leg when walking and she exhibited decreased pinprick sensation in her entire right leg.  She had no weakness in her leg and normal reflexes.  She had good range of motion in her back.  Straight-leg-raising caused pain in her right lower back, but no radiation.  (R. 286-87)  Dr. McKee ordered an MRI of Fair's lumbosacral spine.  The study was "completely normal, with no evidence for any disc disease whatsoever or foraminal

---

[2]When Lasègue's sign is positive, "in sciatica, flexion of the hip is painful when the knee is extended, but painless when the knee is flexed."  Dorland's Pocket Medical Dictionary, 621 (23rd ed. 1982).

impingement . . . [or] spinal stenosis." (R. 286) Dr. McKee prescribed physical therapy and over-the-counter pain medication. (Id.)

Fair began physical therapy for her lower back pain on May 3, 2000. Fair told the physical therapist an MRI had "revealed a pinched nerve" with no sciatic involvement. (R. 210; but see R. 215) Fair reported that her pain increased with weight bearing, gait, and transitional movements such as moving from lying down to sitting. Lying on her side was most comfortable. She stated her fibromyalgia had been well controlled recently. She had a return doctor's appointment scheduled in two weeks which, according to Fair, was "to assess if surgical intervention to clip the nerve will be necessary." (Id.) On examination, the therapist noted Fair was "acutely tender to palpation over the lumbar spine" and hips. Her ranges of motion of her right hip were limited by pain and she had decreased right hip strength. (Id.) Fair continued with physical therapy for a couple of weeks, and although she was noted to be "well motivated and willing to participate in treatment," she did not obtain any significant improvement. (See R. 214-21)

On May 12, 2000, Fair saw Dr. Bernard for follow–up of her back pain. She reported some improvement from physical therapy, but noted she was still having pain in her lumbar area radiating to her right lower thigh and sometimes below the knee. The doctor prescribed OxyContin and Oxycodone, and directed Fair to follow up with the neurologist. (R. 280)

Fair saw Dr. McKee on May 31, 2000, for follow-up of her right hip pain. (R. 282, 286) He referred her to Dr. Gerbracht, who saw Fair on June 12, 2000. Fair reported increased problems with her lateral hips, right greater than left. She complained of problems getting up out of a chair, instituting walking, or laying on her sides at night. On examination, she exhibited "marked tenderness over the lateral aspect of the right hip," and "minimal tenderness to direct pressure over the same area on the left side," but she had full range of motion of both hips without pain. (R. 285) The doctor diagnosed Fair with an iliotibial band strain, which he noted could be "part of a Fibromyalgia

16

syndrome." (R. 284) He administered an anesthetic injection to Fair's iliotibial band on the right with good immediate benefit, which confirmed his diagnosis. He prescribed physical therapy for one week and then home exercises and return to her water exercise program, advised Fair to buy different shoes, and gave her samples of Vioxx. (Id.)

Fair participated in physical therapy on June 15, 21, and 23, 2000, with some improvement in the range of motion of her hips, but then she failed to reschedule for additional therapy. (R. 208)

Fair was seen in the emergency room on June 24, 2000, with complaints of abdominal pain. Notes indicate Fair complained of pain almost before the doctor even touched her, and no matter where she was touched. Abdominal X-rays were negative and blood chemistries were normal. Fair was treated with antispasmodics and a shot of Phenergan. (R. 223-27)

Fair saw Dr. Woodhouse on November 27, 2000, complaining of worsening neck pain. She noted her neck got worse every year at about the same time. She was having some tingling and pain all the way down to her fingers. On examination, the doctor noted Fair had "[a] fair amount of tenderness and spasm . . . more so in the upper thoracic spine." (R. 280) The range of motion in her neck was decreased throughout. The doctor started Fair on Neurontin in a gradually increasing dosage for pain relief. He discussed the possibility of referring Fair for epidural steroid injections, and offered her a neurosurgery consultation, although he did not believe she was a surgical candidate. In addition, Fair was going to check on a home traction device. (R. 279)

An MRI of Fair's cervical spine, performed on November 29, 2000, showed "[degenerative disc changes with posterior marginal osteophytes at C3-4 impinging slightly on the anterior portion of the thecal sac." (R. 303) Dr. Bernard reviewed the MRI results with Fair on December 4, 2000, noting the study showed "a broad-based disc bulge at C3-C4." (R. 289) Fair reported that Oxycodone was helping the pain in her neck but not the pain in her fingers. (Id.)

Fair was seen for neurosurgical evaluation on January 18, 2001. She gave a history of neck pain extending into her shoulders bilaterally, radiating down her entire left arm and throughout her left hand. She complained of constant pain in the fingers of both hands that was gradually worsening. She stated the pain woke her up at night, and prevented her from concentrating, doing bookwork for a family business, doing any housework, or crocheting. She stated chiropractic had not helped the pain, and Neurontin had caused personality changes making her "very aggressive and 'mean.'" (R. 282-83) On examination, Fair exhibited full strength in her upper and lower extremities; decreased range of motion of her cervical spine in all directions; "[s]evere and diffuse tenderness . . . throughout the entire cervical region, throughout the shoulders and throughout all the muscle groups of the arms bilaterally"; normal muscle tone and bulk throughout; decreased sensory sensation in her cervical spine and her entire left leg; and decreased deep tendon reflexes. (R. 283) She was able to walk on her toes and heels without difficulty, and her gait was steady. The neurosurgeon felt Fair's MRI was unremarkable. (Id.)

The doctors assessed Fair with "[e]xacerbation of fibromyalgia." (Id.) They ordered several lab studies, and gave Fair a Medrol Dosepak. She was directed to decrease her Trazodone dosage slowly, adding Amitriptyline in an increasing dosage, and to return in one week for further evaluation and a possible referral to rheumatology. (Id.) When Fair returned to the clinic on January 23, 2001, she reported feeling much better. She was following the schedule of decreasing the Trazodone and increasing the Amitriptyline, and she was scheduled to begin physical therapy the next day; however, the record does not contain treatment notes from any physical therapy at this time. (R. 281)

On April 15, 2001, Fair was seen in the emergency room with complaints of pain and swelling behind her left knee. Notes indicate, "She has been on the road a lot, in

terms of truck driving as an occupation." (R. 229) Doctors prescribed Relafen, and one baby aspirin daily, and Fair was advised to follow up with Dr. Woodhouse. (Id.)

Fair had X-rays of her feet on May 4, 2001, to "[r]ule out heel spur and stress fracture." (R. 302) The films revealed "Hallux valgus deformity of both great toes and hammertoes of the remaining toes of both feet"; "bunion formation in the right first metatarsal phalangeal joint"; and "[b]ilateral 5 mm posterior inferior spurs of the calcaneus." (Id.)

On May 24, 2001, Fair saw Dr. Woodhouse for follow-up of her neck pain. She complained of tender areas up and down her spine, and noted she was under a lot of stress regarding her grandchildren. Examination revealed "several trigger points, a couple over the occipital nerves and a couple more on down her spine, one around T-8 bilateral and another around L-2." (R. 277) All of these trigger points were injected with Marcaine "with pretty good relief of most of her symptomatology." (Id.) Dr. Woodhouse planned to continue with trigger point injections as needed. He noted Fair's current pain was "related more to the fibromyalgia than her cervical stenosis." (Id.) Fair also was going to consider massage therapy, and continue on her current medications. (Id.)

On May 25, 2001, Fair saw Dr. Bahls for follow-up of her fibromyalgia. Fair related her medical history since her last visit to Dr. Bahls in March 1999. (See R. 248) Among other things, Fair stated she had stopped working in June 1998, when she gave up her day care business. She stated she did only light housework, and she had hired a housekeeper to do deep cleaning. She did not do her water exercises in the wintertime because the water was too cold. Fair complained of difficulty walking due to foot pain, memory problems, neck pain, pain at the base of her skull, constant low back pain, intermittent leg pain, pain in the outer two fingers of her left hand, and symptomatic fibromyalgia flares throughout her body. (Id.) Dr. Bahls noted the following on examination of Fair:

> The patient has tenderness through the upper trapezius muscles, along her thoracic paraspinal muscles and across her lumbar muscles and over both greater trochanteric areas and around both shoulders. She had adequate range of motion of her neck but she pulled tight in her left upper trapezius muscle when she looked left. She had full shoulder and scapular movement. She had decreased range of motion in her low back in all directions. Strength was 5 in the upper and lower extremities. Deep tendon reflexes were 2(+) in the upper and lower extremities. Sensation to pinprick was intact in all extremities. Her right calf measured 16 1/2", her left 17".

(R. 247) Dr. Bahls assessed Fair with fibromyalgia by history, degenerative disc disease of the cervical spine, bilateral heel spurs and plantar fasciitis, and probable depression. The doctor felt Fair's decreased memory was probably due to depression, and she prescribed Prozac because it had helped Fair in the past. She directed Fair to stop taking Amitriptyline and resume Trazodone, opining the Amitriptyline was contributing to Fair's weight gain. The doctor also added a muscle relaxant at bedtime to help Fair's neck pain. Fair was referred to physical therapy for her neck, and to learn a home exercise program for her upper extremities and review of her spine stabilization exercises. Dr. Bahls indicated she would be willing to perform a nerve conduction study if ordered by Fair's podiatrist. (Id.)

On May 29, 2001, Fair was seen in the emergency room complaining of increasing diffuse pain in her back and neck. An intramuscular injection of pain killers was administered, and Fair was told to follow up with Dr. Woodhouse. (R. 232) She saw Dr. Woodhouse the next day, and reported "she felt great after getting a trigger point injection but has had a lot of trouble sleeping." (R. 277) She stated she was still under a lot of stress and had developed a few new trigger points. Dr. Woodhouse did eight more trigger point injections, which Fair tolerated well. (Id.)

Fair started physical therapy on May 30, 2001, for her neck and back pain. The therapist assessed Fair's rehab potential as "fair." (R. 236-37) Fair did not tolerate

physical therapy well due to pain. (See R. 246, 233-34) On June 1, 2001, Fair called Dr. Bahls, stating she had turned her neck, "something popped," and the left side of her neck was very painful. Fair's physical therapist also called Dr. Bahls to report that Fair's left upper trapezius muscle was very tight. Fair's left shoulder mobility was better, but Fair did not tolerate manual traction. The therapist intended to try a TENS unit. Dr. Bahls told Fair that if her pain did not improve during the following week, she could receive more trigger point injections. (R. 246)

Fair called Dr. Bahls's office on June 11, 2001, to report on her progress. She continued to have neck and shoulder pain, and she wanted to go ahead and get the trigger point injections. The physical therapist had decided to wait to try a TENS unit "until things calmed down." (Id.) Fair was referred to the "Mercy Nerve Block Center" for trigger point injections. (Id.) Fair saw Roger Kinkor, M.D. on June 13, 2001, for the injections; however, Dr. Kinkor suggested trying another treatment first. (Id.; see R. 244) At that time, Fair rated her pain at 8 on a 10-point scale. She described her pain as being unbearable at times, and virtually continuous in her neck, shoulders, and lower back. (R. 243) Upon examination, Dr. Kinkor noted, "Virtually every area touched on [Fair's] body with the exception of the cranium of the head elicited pain response [from] the patient. . . . The classic fibromyalgia points were positive, including the hips bilaterally, areas over the scapula, but grasping the biceps of the arm resulted in discomfort and patient was generally unable to put forth any reasonable effort with respect to strength testing before complaining of pain." (R. 243-44) Dr. Kinkor opined fibromyalgia was Fair's primary problem. He accepted her statement that she had pain, but reassured her "this was not a serious skeletal abnormality in the neck and . . . tried to point her attention in the direction of the musculature and her general deconditioning." (R. 244) He prescribed a trial of mexiletine "to see if that can provide a degree of relief so that she can increase her activity overall." (Id.) He noted Fair was scheduled for follow-up at the Mercy Anesthesiology Pain Control Center in a couple of weeks, and at

that time, depending on her progress, "consideration should be given to either advancing her mexiletine or supplementing the treatment with actual trigger point injection in the neck area or abandoning the mexiletine or taking another approach." (Id.)

The mexiletine made Fair somewhat nauseated. She was evaluated in the Mercy Anesthesia Pain Control Center on June 29, 2001. She received Cortisone and anesthetic blocks in her right greater occipital nerve and three trigger points in her back. (R. 241)

On July 5, 2001, the physical therapist called Dr. Bahls with an update on Fair's condition. The therapist had treated Fair eight times with little progress. She stated Fair complained of so much pain that she could not tolerate the exercises, and she cried frequently during physical therapy. The physical therapist had suggested to Fair that she see a psychologist to help her with pain management, and Fair indicated she was willing to see someone. Dr. Bahls felt Fair might do better exercising in water, if she could find a pool that was not too cold for her. (R. 245)

On July 20, 2001, Fair called Dr. Bahls's office to report that her podiatrist, Dr. Joseph Newman, had diagnosed her with plantar fasciitis, and he asked her to have an EMG of her lower back. (Id.)

Fair was evaluated at North Iowa Mental Health Center ("NIMHC") on August 2, 2001 (R. 259-63), for "some symptoms of depression, along with the chronic pain disorder of Fibromyalgia." (R. 262) She left with a diagnosis of Depressive Disorder, NOS, and a current GAF assessment of 45, with 50 being her highest GAF in the preceding year. (Id.) The counselor suggested Fair would benefit from individual counseling, supportive therapy, and medical management. (Id.)

Fair next saw Dr. Bahls for follow-up on August 3, 2001. The doctor did an EMG nerve conduction study at the request of Dr. Newman. The test showed "evidence of mild left tarsal tunnel syndrome," but otherwise was negative. (R. 265) Fair reported that her concentration and memory were improved by the Prozac. She reported "some problems with irritable bowel like symptoms with diarrhea and constipation." (Id.) She

expressed frustration because her feet had been too painful for her to walk much. She complained of low back pain radiating into her buttocks. Dr. Bahls ordered an MRI of Fair's lumbar spine to rule out spinal stenosis that could be causing Fair's bilateral lower extremity symptoms. She increased Fair's Trazodone dosage, and suggested Fair might consider getting a hot tub or jacuzzi tub to use at home. She recommended Fair exercise in a pool two to three times per week. (R. 264) The MRI of Fair's lumbar spine was performed on August 5, 2001, and was unremarkable. (R. 301)

Fair saw Dr. Woodhouse on August 13, 2001, "with exacerbation of fibromyalgia." (R. 276) She complained of severe neck and back pain, worsening over the previous two days. The doctor injected six trigger points with Marcaine. (Id.)

On August 20, 2001, Dr. Newman wrote an opinion letter to a state disability examiner in which he stated Fair suffered from bilateral heel pain syndrome that had "proven recalcitrant to oral antiinflammatories, physical therapy, injections of steroids, and use of a night splint." (R. 268) He stated Fair's podiatric prognosis was guarded, and she should be limited to lifting/carrying of twenty pounds maximum, and no prolonged standing or walking. He saw "no problems with her feet in sitting." (Id.) Fair continued taking Prednisone, using night splints, and seeing her podiatrist regularly, but records indicate she was not obtaining any relief of her foot pain. (See R. 359-62)

Fair returned to see Dr. Woodhouse on August 30, 2001, when she received six more trigger point injections. Notes indicate the injections gave her "considerable relief." (R. 275) She received seven trigger point injections on September 12, 2001, and planned to resume intensive physical therapy. (Id.)

On September 20, 2001, Dee E. Wright, Ph.D. reviewed Fair's records and completed a Psychiatric Review Technique form (R. 269-73), and a Residual Mental Functional Capacity Assessment form. (R. 369-82) Dr. Wright concluded Fair would be moderately limited in her ability to carry out detailed instructions, and to maintain attention and concentration for extended periods, but she was not significantly limited in

any other work-related abilities due to a mental impairment. In his review summary, Dr. Wright noted when Fair "is experiencing significant pain, she would have difficulty consistently performing any complex cognitive activity that would require prolonged attention to minute details and rapid shifts in alternating attention." (R. 273) Nevertheless, he concluded Fair "appears capable of sustaining sufficient concentration and attention to perform non complex, repetitive, and routine cognitive activity when she is motivated to do so." (Id.)

Fair saw Dr. Woodhouse again on October 1, 2001, and received seven trigger point injections. He noted Fair had received about two weeks of relief from her previous injections. (R. 274)

Fair's podiatrist referred her to the Mercy Medical Center Arthritis and Osteoporosis Center for consultation regarding her ongoing food pain. Michael J. Finan, M.D. reached the following conclusions from his evaluation of Fair:

1. Chronic pain syndrome. I believe that [Fair] does have a chronic pain syndrome. Actually, she has more widespread trigger points than is typical for fibromyalgia. Her complaints of pain also appear to be somewhat more marked or exaggerated. I doubt that she has a hypothyroid myopathy or inflammatory myositis. On examination, I found no evidence of significant degenerative arthritis or inflammatory arthritis. Considered the possibility of seronegative spondyloarthropathy. However, with a normal sedimentation rate and normal cervical and lumbar spine x-rays, I do not feel this is the case.

2. Complaints of bilateral foot pain. I believe this is part of a chronic pain syndrome. Consider some component of plantar fasciitis. I do not feel this is on the basis of more widespread inflammatory arthritis, such as seronegative spondyloarthropathy.

3. Fatigue, has normal hemoglobin. TSH is pending. I suspect this is part of her chronic pain syndrome.

4. Weight gain related to steroid therapy.

5. Steroid therapy. At this time, I find no evidence of active inflammatory arthritis. I recommend discontinuing.

6. Diagnosis of irritable bowel syndrome.

(R. 320) Dr. Finan recommended Fair continue with Trazodone, Ambien, and Ultram; discontinue the Prednisone; and if she were to receive further trigger point injections, they should be Lidocaine only. He recommended Fair meet with a physical therapist to set up a home exercise program for fibromyalgia, and he prescribed a trial of Effexor. He directed Fair to return in one month for follow-up. (R. 321) At Fair's next visit to Dr. Newman, she reported the Effexor was providing mild benefit. (R. 357-58)

On October 25, 2001, Justin L. Ban, M.D. examined Fair at the request of Disability Determination Services. Dr. Ban noted Fair sat continuously for sixty minutes during the examination with no apparent discomfort. (R. 328) She walked with a normal gait and balance and was able to walk on her heels and toes, but she exhibited difficulty with squatting. She exhibited "abnormal" ranges of motion in her shoulders and cervical spine, and nonfocal tenderpoints. (R. 329) She exhibited tenderness without spasm or guarding in her lumbar paraspinal muscle region and mild tenderness over the spinous processes of the lumbar spine, but no pain with the bilateral active straight-leg-raising test. She exhibited tenderness and crepitation in her hips, and the range of motion of her right hip was limited. There were no other findings of note during the examination. Dr. Ban's diagnosis was fibromyalgia, and he provided the following opinions regarding Fair's work-related abilities:

> [Her] ability to lift and carry is limited to 10 pounds occasionally and 5 pounds frequently. She is able to stand, move about, walk and sit for approximately four hours in an eight-hour day. She can occasionally stoop, climb, knee[l] and crawl. Her ability to handle objects, see, hear, speak and travel is unimpaired. She is intolerant to the work environ-ment on a fulltime basis and should avoid dust, fumes, temperature, hazards, etc.

(R. 331)

At the request of Disability Determination Services, Dr. Finan wrote an opinion letter dated November 5, 2001, in which he reviewed his diagnoses (set forth above), and provided the following opinions regarding Fair's work-related limitations:

> At this time, her major limiting factor, as far as activities, is complaints of pain. I recommend that she not lift and carry more than 10 pounds. I have no specific limitations regarding her degree of standing, walking, and sitting, based upon identification of significant arthritis problems. It appears that her limitation would be related to her subjective complaints of pain. I think it would probably be best that she not be employed in any type of position that required regular stooping, climbing, kneeling, or crawling. From a musculo-skeletal standpoint, I see no significant limitation in the degree of handling. I find no limitation as far as seeing, hearing, speaking, and traveling. I have no specific limitation regarding her work environment, other than one would normally recommend from a safety aspect, regarding dust, fumes, temperature hazards, etc.

(R. 336) As of February 25, 2002, Dr. Finan's opinions regarding Fair's work-related limitations were basically unchanged. (R. 350-51)

On November 27, 2001, Jan Hunter, D.O. reviewed Fair's records and completed Residual Physical Functional Capacity Assessment form. (R. 337-46) Dr. Hunter opined Fair should be able to lift up to ten pounds occasionally, but less than ten pounds frequently; stand or walk at least two hours in an eight-hour workday; sit for about six hours in a normal workday; and push/pull without limitation. He opined she could perform all postural activities (e.g., climbing, balancing, stooping, etc.) occasionally. He found no other limitations on Fair's ability to work. In his comments, Dr. Hunter gave controlling weight to the opinion of Dr. Finan, who was noted by Dr. Hunter to be one of Fair's treating physicians. Dr. Hunter found Fair's credibility to be somewhat eroded based on Dr. Finan's comments that Fair's symptoms were "somewhat magnified" and "she has more then [sic] the typical number of positive tender points." (R. 345) On

April 25, 2002, Claude H. Koons, M.D. reviewed Dr. Hunter's assessment and concurred in the latter's conclusions. (R. 344)

Fair saw Dr. Finan again on November 27, 2001, for follow-up of fibro-myalgia/chronic pain syndrome. (R. 352-53) Fair continued to complaint of generalized musculoskeletal pain, numbness in her hands that awakened her at night, and foot pain. She had followed Dr. Finan's recommendation to limit her caffeine intake, and she was trying a home exercise program as recommended. Upon examination, Fair exhibited full range of motion in her shoulders, although she complained of pain with movement. In addition, Dr. Finan noted Fair "had multiple trigger points of fibromyalgia." (R. 352) The doctor's diagnoses included chronic pain syndrome/fibromyalgia, associated fatigue, and hand dysesthesias which the doctor suspected were related to Fair's fibromyalgia, although he wanted to rule out associated carpal tunnel syndrome. (Id.) He refilled Fair's Effexor, and recommended she discuss her hand numbness with Dr. Bahls for possible nerve studies to rule out carpal tunnel syndrome. (R. 353)

On December 31, 2001, Fair saw Dr. Woodhouse complaining of "terrible pain." (R. 348) The doctor administered six trigger point injections of Marcaine in Fair's back and two injections in her occipital nerves. Fair obtained significant relief about fifteen minutes following the injections. (Id.) Fair received additional trigger point injections on January 14, January 22, and February 4, 2002. (R. 347) On January 27, 2002, an MRI was done of Fair's cervical spine which revealed no abnormalities. (R. 349)

On March 4, 2002, Dr. Newman reiterated his earlier opinion of August 20, 2001. (see R. 268), regarding Fair's limitations due to her foot pain and walking difficulties. (R. 354)

On March 11, 2002, Fair underwent a psychological evaluation at the request of Disability Determination Services. Dan L. Rogers, Ph.D. diagnosed Fair with depression due to fibromyalgia, and adjustment reaction with depressed mood. He assessed her current GAF at 50. He noted Fair was suffering from depression "in reaction to her pain,

limitations, and diminished lifestyle, but she also appear[ed] to be experiencing the combination [of] depression and fatigue that is often observed with fibromyalgia and similar diseases." (R. 365) Dr. Rogers expressed the following opinions regarding Fair's work-related limitations from a mental standpoint:

> It is difficult for her to remember and understand instructions, procedures, and locations, and her pace and concentration are poor enough to impair her ability to carry out instructions even though her attention is likely to remain good. She is limited by her pain in her ability to interact appropriately with others, including supervisors, coworkers, and the public. Her judgment is good but it would neverthe-less be difficult for her to respond appropriately to changes in the work place.
>
> She is able to handle cash benefits though she would need assistance, as from a family member, to keep checkbooks balanced and similar tasks.

(Id.)

On March 26, 2002, Fair returned to see Dr. Woodhouse. She had gone without trigger point injections for a couple of weeks and reported she was "getting to the point where she is unable to do a lot of her stretching exercises." (R. 412) She received eight trigger point injections – three over her left shoulder, one over her right shoulder, and four in her low back. (Id.)

On March 27, 2002, Fair was seen by an occupational therapist, on Dr. Finan's referral, for evaluation regarding her ability to perform activities of daily living. She was instructed in joint protection, heat/cold modalities, active range of motion exercises, work simplification, adaptive equipment, paraffin treatment, and activities of daily living techniques. (R. 366-67)

When Fair next saw Dr. Woodhouse, on April 26, 2002, she stated her fibromyalgia had worsened significantly over the preceding few days. She reported going to the emergency room the night before for help, but the Record contains no evidence of

that E.R. visit. Fair complained to Dr. Woodhouse of pain in her neck and low back. Dr. Woodhouse gave Fair numerous trigger point injections, including three in each of her shoulders, four in her low back, and two in her central nerve. He also increased Fair's Effexor dosage, and directed her to taper her Trazodone dosage down with a goal of getting her off Trazodone. (R. 412)

On April 28, 2002, Fair was evaluated at NIMHC for purposes of preparing a treatment plan for individual counseling relating to her depression. Treatment goals included developing ways to cope with her chronic pain, and learning to focus more on things she is able to do, rather than things she no longer can do. Her prognosis was listed as favorable. Her current GAF was assessed at 40-45, with 45 being her highest GAF during the preceding year. (R. 394-96)

Fair saw Dr. Finan for follow-up of her fibromyalgia on June 25, 2002. She continued to report musculoskeletal pain, greatest in the cervical, trapezius, and upper back/interscapular areas. She also reported significant neck pain. Dr. Finan noted Fair had not received great long-term benefit from her trigger point injections. He noted she had changed medications from Trazodone to Neurontin, and she was reporting some CNS interference from the Neurontin, stating it made her light-headed and unable to think clearly. Fair also reported continued problems with her low back, hips, hands, and feet. The doctor's diagnosis continued to be fibromyalgia/chronic pain syndrome. He ordered an MRI to confirm his suspicion that Fair's cervical pain was predominantly myofascial in origin. He discontinued the Neurontin and reinstituted Trazodone. He directed Fair to return for follow-up in six months. (R. 401-02) The MRI showed early degenerative disc changes in the mid-cervical spine but no disc herniation or other significant findings. (R. 403-04)

A progress note from NIMHC regarding Fair dated August 28, 2002, indicated she was working moderately towards her primary goals, and her overall mental health prognosis remained favorable. (R. 391-92)

On October 7, 2002, Fair was admitted to the hospital for exacerbation of fibromyalgia and uncontrolled vomiting. She complained of muscular pains in her arms and back, especially around her hips and thighs. Admission notes indicate Fair was "in quite a bit of distress" and was "even uncomfortable sitting up." (R. 383) She had vomited fourteen times that day before going to the hospital. Fair was treated with IV fluids, Zofran, and Nubain, and she was started on Toradol for her ongoing pain. (R. 383-84) There is no discharge note in the record, and no other indication of how long Fair remained hospitalized.

Fair saw Dr. Woodhouse on December 11, 2002, for exacerbation of her fibromyalgia. Examination showed multiple positive trigger points, and Fair received Marcaine injections in ten different locations on her back and shoulders. She experienced "considerable relief" from the injections. (R. 411)

On December 17, 2002, Fair returned to see Dr. Finan for follow-up. Fair complained of continued generalized musculoskeletal pain, especially in her neck, low back, and her right buttock/right groin. She reported having to have her rings cut off of her fingers because of increased puffiness and swelling. She stated she had attempted physical therapy in September and October 2002, but according to Fair, the therapist "told her she was in too much pain to get much benefit from the therapy." (R. 399) Dr. Finan prescribed a four to six week trial of a TENS unit and continued Fair on her current medications. He noted he had nothing else "to offer for management of her musculoskeletal pain." (R. 400)

Fair returned to NIMHC for therapy on December 28, 2002. Notes indicate Fair was "working moderately towards her primary goal" of being "able to laugh more than cry," and learning to accept her condition. (R. 388) Her current GAF was assessed at 40-45, and she continued to carry a diagnosis of Major Depression, recurrent, moderate, with Fibromyalgia and Psychosocial Stressors. (Id.)

Fair saw Dr. Finan for follow-up on February 5, 2003. She reported some, although not total, relief of her low back/coccyx area pain from the TENS unit. She was taking Trazodone 150 mg. at night, Chlorzoxazone every eight hours, Ultram 100 mg. four times daily, Tylenol 2 tablets four times daily, and Effexor. "She continued to have multiple trigger points of fibromyalgia." (R. 397) The doctor ordered regular, ongoing lab tests to check Fair's liver function due to her ongoing use of Tylenol. He refilled her other medications and authorized purchase of a TENS unit. He expressly had "no other therapeutic suggestions for [Fair] to manage her chronic pain," and expressed hope that "she will be able to function on the above program." (Id.)

On February 28, 2003, Fair saw a physical therapist for an intake evaluation. She entered a three to four week period of physical therapy to address her increasing neck and shoulder discomfort. She was instructed in a home exercise program, and was scheduled to receive analgesic modalities including ultrasound and hot packs. (R. 409-10)

Fair saw Dr. Hansen for follow-up of her fibromyalgia on February 28, 2003. She noted she had been to physical therapy that day "and it was an extremely painful session" that lasted for about two hours. Her usual medications had given her no relief from her pain. Dr. Hansen noted Fair's "history of fibromyalgia is fairly long standing," and her symptoms had been worsening slowly over time. Fair reported significantly decreased range of motion in her shoulders, and the doctor noted she had "reduced strength throughout all extremities." (R. 405) Fair was barely able to squeeze the doctor's fingers, or move her legs in response to moderate resistance. The doctor noted Fair was "an obese female with a history of deconditioning"; she weighed 218 pounds at this visit. Dr. Hansen administered an intramuscular injection of Toradol and directed Fair to follow-up with Dr. Woodhouse the next morning. (R. 405-06)

When Fair saw Dr. Woodhouse the next day, she reported going to the emergency room the previous night for a Nubain injection to relieve muscle spasms. Dr. Woodhouse administered occipital nerve blocks and eight trigger point injections. (R. 411) Fair

experienced pain relief for a couple of days, but returned on March 5, 2003, for more injections. She again received an occipital nerve block and trigger point injections. (R. 408) Further injections were administered by Dr. Woodhouse on March 21 and April 4, 2003. (R. 407-08)

Fair's progress in mental health therapy was reviewed on April 23, 2003. Her prognosis was noted to be favorable, and she continued to work moderately toward her goals. She was noted to be "sporadic with scheduling and keeping appointments," which the reviewer opined was due to the fact that Fair's goals were "more of maintenance based on her pain level." (R. 415) Her current GAF was assessed at 40-45, with a high of 45 over the past year. (Id.)

Fair saw Dr. Woodhouse for further trigger point injections on April 29, 2003. (R. 424) On May 1, 2003, Dr. Woodhouse performed a fluoroscopic-guided steroid injection into Fair's greater trochanteric bursa, to treat Fair's ongoing pain in that area radiating up into her buttock and down into her leg. (R. 423, 425)

Fair saw her therapist at NIMHC on May 8, 2003. Fair continued to work on coping with her chronic pain, and she stated it had "been a struggle" for her. (R. 413) She reported having less than 50% use of her left shoulder, which, according to Fair, Dr. Woodhouse had told her was due to scar tissue from her fibromyalgia. The therapist diagnosed Fair as suffering from Major Depression with Chronic Pain, and assessed her current GAF at 45. (Id.)

Fair returned to see Dr. Woodhouse on May 14, 2003, complaining of increased left shoulder pain. The doctor injected her shoulder with DepoMedrol and Lidocaine, which gave Fair immediate, substantial relief from her pain. He also injected Marcaine into several trigger points in Fair's back. (R. 422) X-rays of Fair's left shoulder were taken on May 14, 2003, and indicated "Mild AC degenerative joint disease." (R. 431)

Fair saw Dr. Woodhouse again on May 23, 2003. She continued to have a lot of pain and stated she was not sleeping well. She reported getting only a day or two of

relief from her injections.  She reported symptoms that the doctor opined could be sleep apnea, which could exacerbate her fibromyalgia pain.  He prescribed MS Contin 15 mg. at bedtime, and scheduled a sleep study.  (R. 419)  The sleep study was performed on June 6, 2003.  Fair exhibited some airway problems, "poor sleep efficiency, poor quality of sleep, [and] a mixture of alpha and delta rhythm consistent with fairly significant mood and anxiety problems which will need to remain the focus of her care."  (R. 420)  She snored mildly and exhibited occasional apnea.  The doctor's impressions included "Rem related obstructive sleep apnea"; "Sleep disorders related to mood and anxiety disorder"; "Nightmares"; "History of sleep bruxisms"; and "Possibly fibrositis syndrome."  (Id.) The doctor recommended initial treatment with conservative measures, with more aggressive approaches to be considered if necessary; however, the report does not contain details regarding these treatment options.  (R. 420-21)

On June 19, 2003, Fair saw Dr. Woodhouse after having a car accident.  Fair reported falling asleep at the wheel about three-quarters of a mile from her home, and going into a ditch.  She denied any particular injury, numbness, etc., but stated she had done $3500 worth of damage to her car.  The doctor opined Fair was "getting a little over sedated on the medications," and he started tapering her off the Trazodone, putting her on shorter-acting Ativan to help her sleep.  She was directed to continue with the Effexor, possibly adding Wellbutrin or Adderall during the daytime.  He also suggested tapering her off the muscle relaxers.  (R. 419)

Fair returned to see Dr. Woodhouse on July 15, 2003, for follow-up of her medication changes and to review lab results.  She was feeling better and reported being much less groggy during the daytime, although she had experienced withdrawal symptoms from discontinuing the Trazodone.  Fair's lab work showed hypothyroidism and she was started on medication.  The doctor discontinued the Ativan and prescribed Ambien.  He also planned to taper off the Effexor beginning at Fair's next monthly follow-up visit. (R. 418)

Fair saw Dr. Woodhouse again on August 18, 2003, for follow-up. She reported falling more often, with no advance notice or precipitating factors. The doctor reduced Fair's Effexor, discontinued Parafon forte, started her on Skelaxin, and continued her on Ambien. (R. 417)

### 3.  *Vocational expert's testimony*

The ALJ asked VE Julie Svec the following hypothetical question:

> My first assumption is that we have an individual who is 46 years old and was 46 years old at the date last insured. She's 41 years old as of the alleged onset date of disability. She's a female with a high-school education and past-relevant work as you've indicated in [the past relevant work summary], and she has the following impairments. She has fibromyalgia, a history of irritable bowel syndrome, she has status post arthroscopic surgery to the right knee, she has obesity, a depressive disorder not otherwise specified, and an adjustment reaction with depressive mood, sleep apnea, and a chronic pain syndrome, and as a result of a combination of those impairments, she has the residual functional capacity as follows, she cannot lift more than 10 pounds, she cannot stand or walk for more than two out of eight hours, she can only occasionally bend, stoop, squat, kneel, crawl or climb, and only occasionally work with her arms above the shoulder level. This individual should not work at unprotected heights. She is able to do only simple, routine, repetitive work that does not require constant close attention to detail. She does require occasional supervision. She should not work at more than a regular pace, and that's using three speeds of pace being fast, regular, and slow and she should not work at more than a mild to moderate level of stress. Would this individual be able to perform any jobs she previously worked at, either as she performed it or as it is generally performed within the national economy and if so, would you please specify which job?

(R. 72-73)

The VE responded that the individual would not be able to perform her past relevant work due to the lifting limitation of ten pounds, the ability to stand and walk for only two hours out of an eight-hour day, and the requirement that she perform only simple, repetitive, routine tasks. (R. 73) In addition, the hypothetical individual would have no transferable skills to other work within the national economy, and she would be unable to perform the full or a wide range of unskilled work activity. (R. 73-74)

However, the VE testified the hypothetical individual would be able to perform sedentary, unskilled work such as an addresser, final assembler in the optical industry, or cutter and paster. (R. 74)

If further limitations were added to the hypothetical that included difficulties with concentration and pace due to pain and depression, resulting in an inability to complete work tasks in a timely manner up to one-third of the time, the individual would be precluded from all competitive employment. (R. 77)

Similarly, if further limitations were added to the hypothetical (as originally posed, not with the above additions) that included the need to take unscheduled work breaks for thirty minutes or more, two to three times daily, due to pain and fatigue, the individual would be precluded from all competitive employment. (R. 77-78)

The ALJ asked the VE a second hypothetical question, as follows:

> My next hypothetical would be an individual the same age, sex, education, past-relevant work, and impairments as previously specified. And this would be an individual who had the residual functional capacity as follows. She could not lift more than five pounds, standing of less than five minutes at a time, and walking of less than a block at a time. Sitting is limited to 20 to 25 minutes at a time. She can only occasionally bend, stoop, twist her neck, squat, kneel, crawl, or climb. She can only occasionally work with her left arm above the head and reach with the left arm with the arm fully extended. She cannot perform work which requires continuous gripping, fine or repetitive gross or fine manipulation, she should not be exposed to – or she should avoid work

35

around or in humidity or cold or damp situations. She is able to do only simple, routine, repetitive work not requiring close attention to detail. She does require occasional supervision. She should not work at more than a regular pace or more than a mild to moderate level of stress. I assume this individual could not return to past-relevant work, transfer required work skills, or perform the full and/or wide range of unskilled work. Would that be correct?

(R. 74-75)

The VE agreed the individual could not return to past relevant work, transfer required work skills, or perform the full and/or a wide range of unskilled work. Further, there would be no unskilled jobs the individual could perform based on the limitations in the hypothetical. (R. 75)


### 4.     The ALJ's decision

The ALJ found Fair has "severe impairments in combination which include fibromyalgia; status post arthroscopic surgery of the right knee; obesity; depressive disorder NOS and adjustment reaction with depressed mood; chronic pain syndrome; sleep apnea; mild degenerative changes of the cervical spine; May 2003 evidence of mild left AC degenerative joint disease; and history of irritable bowel syndrome[.]" (R. 28, ¶ 3) However, the ALJ found none of these impairments, singly or in combination, equalled the Listing requirements. (Id.)

The ALJ found Fair could not return to her past relevant work, but she retained the residual functional capacity to make the vocational adjustment to other unskilled work that exists in significant numbers in the national economy. (R. 16) He found Fair has the residual functional capacity to lift up to ten pounds, stand/walk for two hours of an eight-hour work day, sit without limitation, and occasionally bend, stoop, squat, kneel, crawl, or climb. He found she can work with her arms occasionally, not over shoulder level; she should avoid heights; she is limited to simple, routine, repetitive work not

requiring constant, close attention to detail; she needs occasional supervision; she can work at a regular pace; and she should avoid more than mild to moderate stress levels. (Id., ¶ 5)

The ALJ found Fair's subjective complaints regarding her limitations not to be fully credible. He noted the record indicates Fair worked after her alleged onset date. He pointed to a medical record dated March 18, 1999, noting Fair was caring for three children in day care. (R. 17, citing R. 253) ("She did decrease the children in her day care and she only takes care of 3 and that has been helpful to her.") The ALJ also noted Fair had not listed bookkeeping or truck driving on her work histories, but medical records from April 26, 2000, refer to her doing bookkeeping for a family business (R. 17, citing R. 287, and other records refer to Fair engaging in truck driving activities. (Id., citing R. 228-29) The ALJ noted these medical records "also contain references that appear to accurately reflect the claimant's age," and the ALJ found Fair's denials regarding the substance of these records were not credible. (R. 17) He noted, "No persuasive explanation has been offered for the inconsistencies," and found Fair "had not been forthright in presenting information to others including the Social Security Administration/the undersigned." (Id.) The ALJ concluded that although this evidence was insufficient to establish that Fair engaged in substantial gainful activity, it was "an indication of involvement in a range of daily activity not consistent with disability from all work." (R. 18) In addition, the ALJ noted Fair "does not have a long work history with steady, higher earnings to add to the credibility of her allegations." (R. 21)

The ALJ further noted that although Fair's treating medical providers have been aware of her allegations regarding her symptoms and functional limitations, none of them precluded her from all work activity. (R. 19) In August 2001, her treating podiatrist limited her to a maximum of twenty pounds lifting/carrying, and advised her to avoid prolonged standing and walking. However, he saw "no problems with her feet in sitting." (Id., citing R. 268) The podiatrist reiterated his comments March 2002. (Id., citing

R. 354)  The ALJ gave these opinions "a good deal of weight," and noted his residual functional capacity assessment included a lifting and carrying requirement "even less than that indicated by the treating podiatrist." (R. 19)

The ALJ further gave great weight to the opinion of Fair's treating doctor M.J. Finan, M.D., who opined, in November 2001, that Fair should avoid lifting or carrying more than ten pounds, and avoid "regular stooping, climbing, kneeling or crawling." (Id.)  However, Dr. Finan listed no restrictions in Fair's ability to handle objects or travel, and no restrictions on her work environment.  (R. 19-20)  He further found "no evidence of significant degenerative arthritis or inflammatory arthritis."  (R. 20)

The ALJ also gave great weight to the opinions of J.L. Ban, M.D., with regard to Fair's functional capacity, although he gave no weight to Dr. Ban's opinion that Fair should avoid exposure to "dust, fumes, temperature, and so forth," because the ALJ found Fair to have no medically-determinable impairment that would provide a reasonable basis for environmental limitations.  (Id.)

The ALJ further relied on the opinions of the two medical consultant physicians that Fair should be capable of work activities consistent with the residual functional capacity found by the ALJ.

The ALJ found the record establishes that Fair's depression is manageable with medication, and he noted Fair had failed to follow through with recommendations that she receive individual counseling.  (R. 21-22)  He found Fair's "sporadic attendance" and the therapist's failure to refer Fair to a psychiatrist for further treatment "are both indications of the non-disabling and minimal nature of any purported symptoms."  (R. 22)  The ALJ found the opinion of the DDI consulting psychologist in March 2002, to be inconsistent with all of the evidence in the record, and he therefore gave the opinion no weight.  (Id.)

The ALJ evaluated Fair's mental limitations under the Listings and found her restrictions of the activities of daily living "have been no greater than mild in degree due to a mental impairment."  (Id.)  He further found that inconsistencies in the record

concerning Fair's work activity and subjective complaints indicated Fair was "likely much more active than she had sought to indicate in her questionnaires and at the hearing." (R. 23) He found her difficulties in maintaining social functioning to be "closer to mild in degree," noting she visited friends at their homes, talked with friends and relatives over the phone, was exposed to others during weekly grocery shopping, and got along "very well with former employers, supervisors and co-workers." (R. 23, citing R. 142)

The ALJ found Fair's difficulties in maintaining concentration, persistence, or pace fell "in a range between mild to moderate." (R. 23) He noted she "has retained the ability to drive which suggests a very good ability to attend and concentrate, which is necessary for her to be aware of, and respond appropriately to changing traffic situations, traffic signs, traffic signals, and so forth, at times instantaneously." (Id.) He also noted Fair "was able to attend to, and respond appropriately to questions asked of her at the hearing." (Id.)

The ALJ noted additional inconsistencies in the record, as well:

> On her Disability Report, the claimant had maintained that her doctor told her she needed to stop work due to her health. The claimant alleged to the therapist in August 2001 that "Doctor Balls [sic] recommended she not work." The undersigned has reviewed the treatment notes of treating doctor D. Bahls, M.D., prior to and subsequent to June 12, 1998. The notes reflect that on February 3, 1998, treating doctor Bahls felt that decreasing the workload by the claimant in her day care would help. There is no indication that the claimant was advised to end work. As indicated, the claimant stated to her treating doctor on March 18, 1999 that she was continuing to care for three children in her day care. As of that date she stated she had done two to three days of painting as well. There is no indicating that the treating doctor told her to stop work on that date, which is far beyond June 12, 1998. There is no indication that other treating doctors had told the claimant to stop working as of June 1998 or other near date. The inconsistencies affirm a finding that the

> claimant has not been completely straightforward in providing
> information to others.

(Id., citations to exhibits omitted).

The ALJ found Fair's allegations that her pain and fatigue are of a work-precluding degree of severity, and that she has significant problems with her hands, similarly are unsupported by the record evidence. (R. 24) He found medications had been effective in reducing Fair's symptoms, and the evidence indicated her functional limitations were not as significant as Fair alleged. (R. 24-25)

The ALJ noted Fair maintained she could sit for only twenty to twenty-five minutes at a time, which the ALJ found to be inconsistent with the medical evidence of record. (R. 26) The evidence indicates Fair has no significant degenerative or inflammatory arthritis or degenerative changes of her spine or hips, and she has had inconsistent complaints of pain in her shoulders. (R. 25-26)

Overall, the ALJ found the record evidence did not support Fair's complaints regarding her levels of pain and her functional limitations, and he therefore did not give her subjective complaints much weight, except to the extent her complaints were consistent with the ALJ's residual functional capacity assessment. (See R. 28, ¶ 4)

The ALJ relied on the VE's testimony, considering the ALJ's RFC findings, in concluding Fair could perform unskilled work that exists in substantial numbers in the economy. (R. 27-28)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing Ingram v. Chater, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  Dixon, 353 F.3d at 605; accord Lewis v. Barnhart, 353 F.3d 642, 645 (8th Cir. 2003).  The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; Kelley, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); see Lewis, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing Bradshaw v. Heckler, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); Dixon, supra. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. See id. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26,

2003).  The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(4)(v); Dixon, supra; Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998)); Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled.  20 C.F.R. § 404.1520(r)(v).

## B.  The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole.  Hensley v. Barnhart, 352 F.3d 353, 355 (8th Cir. 2003).  This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole.  Id. (citing Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998) (citing Matthews v. Bowen, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .").  "Substantial evidence has been described as 'less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.'"  Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (quoting Brosnahan v. Barnhart, 336 F.3d 671, 675 (9th Cir. 2003)).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Krogmeier, 294 F.3d at 1022 (citing Craig, 212 F.3d at 436); accord Draper, 425 F.3d at 1130.. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003) (also citing Cline, supra).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. Sobania v. Secretary of Health & Human Serv., 879 F.2d 441, 444 (8th Cir. 1989) (citing Steadman v. S.E.C., 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," Baldwin, 349 F.3d at 555 (citing Bates v. Chater, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996) (citing Naber v. Shalala, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." Id. (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992), and citing Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989)); accord Baldwin, 349 F.3d at 555; Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994) (citing Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992)); accord Krogmeier, 294 F.3d at 1022 (citing Woolf, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Baldwin, 349 F.3d at 555 (citing Grebenick v. Chater, 121 F.3d 1193, 1198 (8th Cir. 1997)); Young, 221 F.3d at 1068; see Pearsall,

274 F.3d at 1217; Gowell, 242 F.3d at 796; Spradling v. Chater, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. See, e.g., Young v. Secretary of H.H.S., 957 F.2d 386, 392 (7th Cir. 1992) (citing Cheshier v. Bowen, 831 F.2d 687, 690 (7th Cir. 1987)); Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987), cert. denied, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); Hardaway v. Secretary of H.H.S., 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. See Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); see also Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in Polaski v. Heckler:

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

Polaski, 739 F.2d 1320, 1322 (8th Cir. 1984). Accord Ramirez v. Barnhart, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV. ANALYSIS

Fair argues the ALJ's decision is not supported by medical evidence of how her mental impairments affect her work-related abilities. She further argues the ALJ failed to evaluate her credibility properly pursuant to the Polaski standards. (See Doc. No. 12) The court agrees the ALJ improperly discounted Fair's subjective complaints, as well as substantial evidence in the record that Fair is disabled. However, the court further finds Fair did not become disabled as early as she alleges in her application.

The record indicates Fair was still relatively active, keeping a few children in her home daycare, and responding well to medications at least up to May 1999, when she began having increased knee pain that was not relieved by medications or physical therapy. While attempts to alleviate Fair's knee pain worsened, the record also indicates Fair's back and neck pain were worsening. In September 1999, Fair's chiropractor noted he had been working with Fair for several weeks but her condition was continuing to worsen. The evidence of record indicates Fair's overall chronic pain, decreased ranges of motion, and inability to perform ordinary, everyday activities continued on a gradual decline from this point forward. Although she received short-term relief from trigger point injections and medications, her condition never improved markedly, and she has continued to have pain despite all treatment modalities. The court finds that by November 27, 2000, Fair's symptoms had worsened in severity to the point of being disabling.

The evidence further indicates that as a result of her declining physical condition, Fair developed depression, the severity of which tends to wax and wane in tandem with her pain levels at any given time. Of some significance is the fact that her Global Assessment of Functioning was never over 45-50 from August 2001, forward, with her GAF usually being assessed at 40-45. "A GAF between 41 and 50 indicates serious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Morgan v. Commissioner of Social Security,

46

169 F.3d 595, 598 n.1 (9th Cir. 1999). Even the state agency psychological consultant who evaluated Fair assessed her GAF at 50, and he noted Fair likely was "experiencing the combination [of] depression and fatigue that is often observed with fibromyalgia and similar diseases." (R. 365) He opined Fair would have difficulty performing in the workplace due to depression. (Id.)

Although the ALJ found Fair to have a number of severe impairments, including fibromyalgia and chronic pain syndrome, the court finds the ALJ failed to recognize the debilitating nature of fibromyalgia in considering Fair's symptoms. This court reviews dozens of appeals from the denial of disability benefits, and sees allegations of disability due to fibromyalgia on a regular basis. However, the undersigned has seldom seen a record of continuous, ongoing medical treatment for the disease to rival the frequency and degree of treatment Fair has been receiving since the fall of 2000. The court finds Fair's credibility is bolstered by the fact that she has continued to seek treatment for her condition on an ongoing basis. The court further notes that if Fair's treating physicians thought she was malingering, drug-seeking, or otherwise was not being truthful with them, they would not have continued to prescribe pain medications and administer pain-relieving injections on a regular basis.[3]

The Eighth Circuit Court of Appeals has "long recognized that fibromyalgia has the potential to be disabling[.]" Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004). In this case, as in Forehand, the records from the claimant's treating physicians "amply support her allegations of pain and limitation." Forehand, 364 F.3d at 988. The DDS consulting physician who examined Fair opined she could sit for no more than four hours in an eight-hour workday, a conclusion that is consistent with her subjective complaints. Although her treating physician Dr. Finan did not place limitations on Fair's

---

[3]On the issue of the two conflicting doctor's entries regarding Fair's employment status, the court attributes those to scrivener's errors. Although it is possible Fair rode along with her husband in his trucking business on occasion, there is no evidence Fair ever worked as a truck driver.

ability to sit, walk, or stand, he qualified that statement by noting he had no limitations "based upon identification of significant arthritis problems," and he noted Fair's work-related limitations would be due to her subjective complaints of pain. (R. 336) There is no evidence in the record to support the RFC arrived at by Dr. Hunter when he opined Fair could sit for six hours in a normal workday, or that she could perform all types of postural activities occasionally. Similarly, the court finds no substantial support in the record for the ALJ's conclusion that Fair could sit without limitation, or could work at a regular pace. When the VE considered an individual with limitations the court finds to be credible, the VE opined the individual would be precluded from all competitive employment.

Further, in considering Fair's credibility, the court does not find it significant that Fair continued to keep three children in her daycare for a period of time. The fact that she continued to try to work "is not proof positive that [s]he is not disabled[.]" Wilder v. Chater, 64 F.3d 335, 338 (8th Cir. 1995). Furthermore, the ALJ found none of Fair's work attempts after her alleged disability onset date amounted to substantial gainful activity. In addition, Fair's continued attempts to participate in activities such as visiting friends, or event attempting to dance on one occasion, do not support a finding that she retains the ability to work. As the court noted in Forehand:

> [A claimant's] ability to engage in some life activities, however, does not support a finding that she retains the ability to work. See Brosnahan [v. Barnhart], 336 F.3d [671], 677 [(8th Cir. 2003)] ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity."). We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v.

> Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).
> This test is consistent with relevant regulations on the issue,
> see 20 C.F.R. § 404.1545, and we have reiterated it on a
> number of occasions. . . . [Citations omitted.] Notwith-
> standing this well-settled case law, out mandate is frequently
> ignored, and appears to have been in this case.

Forehand, 364 F.3d at 988.

Similarly, the Eighth Circuit's mandate seems to have been ignored here. Substantial evidence in the record supports a finding that Fair is unable to perform the day-in, day-out activities required to maintain employment, and that she has been disabled since November 27, 2000.


## V. CONCLUSION

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." Cline, 939 F.2d at 569 (citing Jefferey v. Secretary of H.H.S., 849 F.2d 1129, 1133 (8th Cir. 1988); Beeler v. Bowen, 833 F.2d 124, 127-28 (8th Cir. 1987)); accord Thomas v. Apfel, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits). In this case, the court finds the ALJ's decision should be reversed, and this case should be remanded for calculation and award of benefits.

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, that unless any party files objections[4] to the Report and Recommendation in

---

[4]Objections must specify the parts of the report and recommendation to which objections are made.

accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, the Commissioner's decision be reversed, and this case be remanded for calculation and award of benefits.[5]

**IT IS SO ORDERED.**

**DATED** this 9th day of November, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections.  See Fed. R. Civ. P. 72.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.  See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

[5]NOTE: If the district court adopts this recommendation and final judgment is entered for the plaintiff, the plaintiff's counsel must comply with the requirements of Local Rule 54.2(b) in connection with any application for attorney fees.